| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**SAUL EWING LLP**<br>Turner N. Falk, Esq.<br>Centre Square West<br>1500 Market Street, 38th Floor<br>T: (215) 972-8415<br>turner.falk@saul.com<br>*Counsel for Ferrari Financial Services, Inc.* |

| In Re: | Case No. 25-14559-MBK |
|---|---|
| Salvatore Faenza | Chapter 11 |

**OBJECTION OF FERRARI FINANCIAL SERVICES, INC. TO CONFIRMATION OF SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION**

Ferrari Financial Service, Inc. ("FFS") hereby files this Objection to the confirmation of the Small Business Debtor's Plan of Reorganization [D.I. 30] filed July 29, 2025 (the "Plan"). In support of the Objection, FFS states as follows:

**PRELIMINARY STATEMENT**

1. The Plan is unconfirmable for three independent reasons.

2. **First**, the Plan proposes to treat FFS, a secured creditor, in a manner contrary to the Bankruptcy Code by purportedly "surrendering" a vehicle that the Debtor does not actually intend to convey to FFS. The Debtor does not provide FFS with the indubitable equivalent of its secured claim, in violation of the Bankruptcy Code.

3. **Second**, the Plan does not pass the "best interest of creditors" test: it treats FFS (and unsecured creditors generally) worse than a chapter 7 liquidation would because it allows the Debtor to retain non-exempt value in his allegedly-profitable business and in his primary residence — in excess of $700,000 — while paying unsecured creditors only $520,000 over 60

56064921.3

months. If the Debtor's interest in the real property alone was liquidated, it would provide a superior return for creditors.

4. **Third**, the projected payment to creditors is illusory because the Plan is not feasible. The Debtor proposes to fund the necessary Plan payments, in excess of $8,600 per month, from the net profits of his businesses. However, during the pendency of this bankruptcy, those businesses have generated at most **$750 per month in net revenue**. It is not plausible to expect the Debtor's businesses to increase their net profits by over 1,000%, and for the Debtor to make all of that revenue available for Plan payments while ignoring his monthly expenses.

5. In effect, this Plan proposes to free the Debtor from his substantial car finance and extensive credit card debt while allowing him to keep control of – and all relevant revenues from – his businesses, and retain his valuable primary residence. This Plan is not only impossible to perform, it directly violates the Bankruptcy Code and cannot be confirmed.

## BACKGROUND

6. On April 30, 2025 ("Petition Date"), Salvatore Faenza (the "Debtor") filed a voluntary petition for bankruptcy relief under Subchapter V of Chapter 11 of the Bankruptcy Code.

7. On June 30, 2023, Ferrari of Central Florida and the Debtor entered in a loan agreement, account number 0270035026 (the "Loan Agreement") relating to the purchase of a 2023 Ferrari SF90 Stradale, VIN #ZFF95NLA0P0292335 (the "Vehicle"). The Loan Agreement was assigned to FFS. The Loan Agreement is secured by the Vehicle. The Debtor asserts in his schedules filed on June 2, 2025, that the Vehicle is worth $515,000.00. FFS is thus oversecured

and entitled to interest at the contractual annual percentage rate of 10.74% plus applicable fees and charges. See 11 U.S.C § 506(b).

8. Payments were made pursuant to the Loan Agreement until May 14, 2025. The payoff of the Vehicle through May 16, 2025 is $469,913.36[1].

9. FFS timely filed a proof of claim (the "Claim") for $469,913.36, secured by the Vehicle. See POC 28-1. As of the date of this Objection, no objection to the Claim has been filed.

10. On July 29, 2025, the Debtor filed the Plan. In relevant part, the Plan treats FFS as follows:

   a. FFS's Claim is the sole claim in Class 4, an impaired class entitled to vote.

   b. The Debtor proposes to surrender "any interest in" the Vehicle to FFS, but does not have possession of, or know the location of, the Vehicle.

   c. The Debtor will then sue FFS and others involved in the Loan Agreement because the Debtor committed fraud in order to close on the Loan Agreement and obtain the Vehicle.

   d. The Debtor asserts that FFS may end up with a general unsecured claim, which is presumably entitled to placement in Class 6 and a pro rata share of $520,000, to be paid from projected disposable business income in the amount of $8,666.66 for 60 months.

11. FFS timely cast a ballot to reject the Plan.

12. As a result, Class 4, which contains only FFS, has rejected the Plan.

---

[1] This amount is subject to change as daily interest of $136.98 continues to accrue on the loan.

56064921.3

# ARGUMENT

### I. The Plan Does Not Treat FFS's Fully-Secured Claim in Compliance with the Bankruptcy Code

13. The Plan proposes to "surrender" the Debtor's "interest in the Vehicle" to FFS. However, the Debtor <u>does not</u> propose to surrender the Vehicle to FFS.

14. It is unclear which provision of the Bankruptcy Code the Debtor seeks to use to accomplish this "surrender" since that term is not used in the chapter 11 portions of the Bankruptcy Code.

15. Some cases indicate that surrender proposed in a plan must actually be accomplished before that plan can be confirmed. *United States v. White*, 340 B.R. 761, 766 (E.D.N.C. 2006), aff'd sub nom. *In re White*, 487 F.3d 199 (4th Cir. 2007).

16. *White* is instructive in another way as well: in that case the debtors proposed to surrender to the IRS certain personal property to satisfy their tax debt. But the IRS was not – legally or practically – able to monetize these items. The District Court overruled the bankruptcy court in that case, holding that the debtors had sought confirmation of a plan "proposing a surrender that could not be consummated." <u>Id</u>. at 766. The proposed surrender was deemed invalid and the plan could not be confirmed. <u>Id</u>.

17. This result is the same when reasoning from the Bankruptcy Code's language as well. A plan is only fair and equitable to a secured creditor if the secured creditor either retains its lien and is paid the amount of the collateral over time or the plan provides "for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(i), (iii).

18. The "indubitable equivalent" is the practical provision of actual equivalent value to the secured creditor:

> Congress did not adopt indubitable equivalent as a capacious but empty semantic vessel. Quite the contrary, these examples focus on what is really at stake in secured credit: repayment of principal and the time value of money. Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors' collateral value and the time value compensating for the risk and delay of repayment. Indubitable equivalent is therefore no less demanding a standard than its companions.

*In re Pac. Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009).

19. The Third Circuit has given this "indubitable equivalent" requirement a flexible, practical construction. "[T]he scope of the "indubitable equivalent" prong is circumscribed by the same principles that underlie subsections (i) and (ii), specifically, the protection of a fair return to secured lenders." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310–11 (3d Cir. 2010), as amended (May 7, 2010). The *Philadelphia Newspapers* court listed a number of different mechanisms that might provide the indubitable equivalent: a cash payout, a collection of notes fully-secured by real property, and an exchange of collateral for other collateral of the same value. Id. at 311.

20. In one chapter 11 case, the court found that a plan proposing a surrender of only a portion of the collateral was "much more controversial and more difficult to confirm." *In re SUD Properties, Inc.*, Case No. 11-03833-8-RDD, 2011 WL 5909648 at *11 (Bankr. E.D.N.C. Aug. 23, 2011). In that case, the debtor proposed to surrender some parcels of real property to the secured creditor that were allegedly sufficient to address the amount owed. That court found the debtor could not prove the partial surrender actually provided the secured creditor the "indubitable equivalent" of its claim, and denied confirmation. Id. at *16-21.

21. In the context of a bankruptcy plan, "The term 'surrender' was contemplated by Congress to be a return of property and a relinquishing of possession or control to the holder of the claim." *In re Stone*, 166 B.R. 621, 623 (Bankr. S.D.Tex. 1993).

22. When a vehicle already in possession of a secured creditor is surrendered to that creditor, the value of vehicle reduces the secured creditor's claim: "a proposed surrender leaves the creditor with an unsecured claim for any deficiency to which it would be entitled under state law." *In re Carter*, 390 B.R. 648, 653 (Bankr. W.D. Mo. 2008).

23. The Plan proposes illegal, unconfirmable treatment of FFS's Claim. **FFS will not retain its lien, will not receive any payments over time on account of its status as a secured creditor, and will not receive the Vehicle.**

24. Instead, the Debtor proposes to give FFS a mere paper "interest" in the Vehicle and not oppose any attempt to repossess or foreclose.

25. This is not – in any sense – the actual conveyance of the Vehicle to FFS's possession so FFS can realize the value of the Vehicle. It simply does not provide FFS with any kind of approximation, let alone the equivalent, of its fully-secured claim.

26. Further, the proposed surrender is actually a partial surrender. The Debtor owns the Vehicle and has the legal right to possess it, regardless of who is presently driving it. The Debtor's Plan proposes to give FFS a mere paper right, effectively a partial surrender of some of the meaningful interests that he has in the Vehicle.

27. Further, it is not clear what form this proposed "surrender" would take, and whether it could be accomplished in a legally-effective manner.

28. In sum, the Plan proposes to implicitly divest FFS's lien, convey a worthless paper right to the Vehicle, and do nothing further to ensure that FFS actually realizes any value.

56064921.3

29. The Plan per se fails to provide FFS any of the treatments permitted by Section 1129(b)(2)(A), and cannot be confirmed.

## II. The Plan Violates the Best Interest of Creditors Test

30. Bankruptcy Code section 1129(a)(7) requires a plan to pass the "best interest of creditors" test, such that each claim "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."

31. In the context of a similar statutory provision, numerous courts have held that a fully-secured creditor would conclusively be paid in full in a hypothetical chapter 7 liquidation. *Official Comm. of Unsecured Creditors of 360Networks (USA) Inc. v. AAF–McQuay, Inc. (In re 360Networks (USA) Inc.)*, 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005) ("Under § 547(b)(5), a transfer to a fully secured creditor is immunized from preference attack because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral."); see also In re Johnson Mem'l Hosp., Inc., 470 B.R. 119, 125 (Bankr. D. Conn. 2012) (same).

32. The Plan clearly violates this standard, because FFS is a fully-secured creditor and the Plan proposes to give FFS a meaningless and valueless paper interest, then potentially pay FFS as an unsecured creditor pro rata for less than the full value of its Claim.

33. Since, in a hypothetical chapter 7 liquidation, FFS would receive the full value of its Claim, the Plan provides worse treatment and cannot be confirmed.

34. Even if this issue is ignored, the Plan still provides unsecured creditors worse

7

treatment than a chapter 7 liquidation.

35. The Plan includes a chart showing the Debtor's alleged assets and debts. This perfunctory liquidation analysis allegedly demonstrates that creditors are being treated better than they would be in a liquidation. It does so by making several provably false assumptions.

36. First, the liquidation analysis assumes that the surrender of the vehicle to FFS is permissible, effective and fully compensates FFS, reducing its claim to $0.00. As discussed above, the proposed surrender is not permissible, but even if it is, there is no reason to conclude that FFS has no unsecured claim. In fact, if the proposed surrender is permitted, FFS could well have its secured claim transformed into an unsecured claim, without realizing any value to reduce that claim.

37. In effect, the unsecured claims pool in the Plan is actually roughly $500,000 greater than projected. The unsecured claims pool in the projections also intentionally omits unsecured deficiency claims and claims rendered unsecured by the avoidance of a judgment lien, without any legal basis to do so.

38. The projections also estimate only $15,000 of chapter 11 administrative expenses, an amount that is not plausible in this case, where Debtor's counsel and the Subchapter V Trustee must be paid administrative expenses.

39. The projections also omit any valuation for the Debtor's businesses. These businesses allegedly generate millions of dollars in gross sales, monthly net profits, and are the cornerstone of the Debtor's ability to fund the Plan. These two businesses are allegedly able to generate the $8,666.66 per month needed to fund the Plan. It is entirely implausible to suggest that the value of these businesses is $0.00.

56064921.3

40. Further, the Plan alleges that the Debtor has valuable causes of action against a number of persons. The Plan is not clear who will receive the proceeds of these causes of action, so this may be another valuable asset the Debtor intends to retain, which asset would be monetized for creditors in a liquidation.

41. Most important of all, the Debtor proposes to pay unsecured creditors $520,000 while retaining his half interest in his primary residence, the sale of which would generate approximately $700,000 for the estate.

42. With all these material assets and debts unquantified, improperly quantified or improperly treated, the Debtor cannot carry his burden to show that this Plan treats creditors better than a chapter 7 liquidation. The assets the Debtor wishes to keep, even taken by themselves, would provide a greater return in a liquidation. The Plan cannot be confirmed.

### III. The Plan is not Feasible

43. The Plan allegedly includes financial projections in a purported Exhibit A. As of the filing of this Objection, those projections have not been filed or circulated to FFS.

44. The most current financial information filed by the Debtor are the April and May 2025 monthly operating reports. See [D.I. 28, 29].

45. The May 2025 MOR alleges cash receipts – for the Debtor personally and for his two businesses – in the amount of $6,983.00, disbursements of $6,277.00 and net cash flow of $705.14.

46. The business bank statements attached to the May 2025 MOR show substantially the same information: beginning and ending monthly bank balances are roughly the same, demonstrating minimal net cash flow from the businesses.

47. The Debtor estimates his net cash flow for "next month" – June 2025 – at $2,200.00.

48. The Debtor's ability to fund 60 months of $8,666.66 is entirely fantastical. It is supported by no evidence or projections, and is patently implausible on its face.

49. Even if the proposed sale of the 39 Spyglass Drive property closes as alleged, it will generate only around $97,500.00 in net proceeds after the applicable mortgage and closing costs are paid, leaving the Debtor to pay $455,000 over 60 months.

50. The Debtor's disclosed financials show it is impossible for him to make the required $7,583.33 monthly payment from his personal earnings and business revenue.

51. Even this reduced number is ten times the net cash flow in his May MOR, and 345% of the Debtor's overly-optimistic projection of what he should net in June.

52. Further, the Debtor proposes in the Plan for his "Skillet By Sal" business to pay $500 per month to secured creditor Lendbug, adding an additional long-term expense that a preconfirmation estimate of cash flows will not cover.

53. These numbers are so disproportionate that is it likely the Debtor cannot make a single payment from his cash flows.

54. In fact, there is no reason why the Debtor cannot disburse the real estate sale proceeds when the sale closes – and his delay in doing so is prejudicial to creditors. This explains why the Debtor proposes to realize nearly $100,000 from the sale of real estate, but pay those funds to creditors only over time: he may intend to use the real estate proceeds to make 100% of the first few payments before defaulting on the Plan.

56064921.3

55.  Regardless of whether the Debtor seeks to delay payment merely to prejudice unsecured creditors, or to cover for his inability to make payments from net cash flow, the Debtor's own facts show he will inevitably default on the Plan.

56.  Because the Plan is not feasible, it cannot be confirmed.

## CONCLUSION

57.  For the reasons discussed above, the Court must deny confirmation of the Debtor's Plan.

Dated: August 27, 2025				SAUL EWING LLP

						*/s/ Turner N. Falk*
						Turner N. Falk, Esq.
						Centre Square West
						1500 Market Street, 38th Floor
						T: (215) 972-8415
						turner.falk@saul.com
						*Counsel for Secured Creditor,*
						*Ferrari Financial Services, Inc.*

56064921.3